In re Boyce Murrell BOX and L. Louise Box, Debtors.

**TRI–CONTINENTAL LEASING CORPORATION, Plaintiff,**

v.

**Boyce Murrell BOX and L. Louise Box, Defendants.**

Bankruptcy No. 283–00110.

United States Bankruptcy Court, N.D. Texas, Amarillo Division.

Jan. 23, 1984.

James C. Herring, Amarillo, Tex., for plaintiff.

Josiah M. Daniel, III, Amarillo, Tex., for defendants.

## MEMORANDUM AND ORDER

BILL H. BRISTER, Bankruptcy Judge.

■ Tri-Continental Leasing Corporation ("Tri-Continental") filed motion for relief from stay to permit it to foreclose its claimed liens against an office building in Amarillo, Texas, and against personal property in the form of mining equipment located in another state. The First State Bank of Talihina, Oklahoma ("Bank"), a judgment creditor of the debtors, intervened and seeks an order directing Tri-Continental to first attempt to liquidate its indebtedness by foreclosing its lien against the personal property before proceeding to fore-

close its lien against the office building, the only known property against which the bank's judgment lien[1] attaches. Debtors challenge the amount claimed by Tri-Continental to be owing on its note. The following summary constitutes findings of fact and conclusions of law after nonjury trial.

Most of the salient facts are uncontroverted. The record is clear that on February 4, 1982, Boyce M. Box, individually and as president of Amarillo Mining, Inc., executed a promissory note to the order of Tri-Continental Leasing Corporation in the face amount of $421,012.80, payable in sixty equal and successive monthly installments of $7,016.88 each, commencing on or before February 15, 1982. Boyce M. Box and wife, L. Louise Box, executed a deed of trust for the benefit of Tri-Continental, reflecting that the conveyance was made in trust to secure payment of "one certain promissory note of even date herewith in the principal sum of $250,000.00, executed by Amarillo Mining, Inc. and guaranteed by grantors, payable to the order of Tri-Continental Leasing Corporation." Also, debtors executed a security agreement against a model 125C Crawler Mounted Dry Bank Placer Plant which Box warranted would be kept at "Highway 9, three miles south of Fair Play (Park County), Colorado, on Red Hill Ranch." Both the deed of trust and the security agreement were dated February 4, 1982, the same date upon which the $421,012.80 note was executed. However, the deed of trust did not refer to the $421,012.80 note, but described only a $250,000.00 note. A "payment authorization" executed at the same time referred to the loan as being one for $250,000.00. The indebtedness contemplated by the security agreement which was executed contemporaneously with the deed of trust, note, and payment authorization appears to be "all monies due and to become due under a secured promissory note executed by Amarillo Mining, Inc. and Boyce M. Box and dated 2–4–82."

Although there is some discrepancy between the note described in the deed of trust and the note which actually was executed by Amarillo Mining, Inc. and by Boyce M. Box it is clear that a loan of $250,000.00 was intended by the parties. The $421,012.80 note included "add-on" interest at a rate which is not reflected by any of the relevant documents. However, while a principal loan of $250,000.00 was contemplated by the parties, Amarillo Mining, Inc. and Box did not receive all of those monies. The "payment authorization" executed by Amarillo Mining, Inc. and by Box authorized Tri-Continental, when disbursing the proceeds of the $250,000.00 loan, to *withhold* $7,016.88 as the first monthly payment due under the loan. The balance of the loan proceeds were directed to Amarillo Land & Title, Inc. of Amarillo, Texas as escrow agent with instructions to "use such of the funds as are necessary to pay all liens and encumbrances against the office building" described on the deed of trust. The net loan proceeds in the sum of $242,983.12 were received and distributed by Amarillo Land & Title Company on February 12, 1982.

The parties have agreed that the value of the office building against which Tri-Continental and the bank each claim liens is $188,300.00. The only evidence in the record as to the value of the mining equipment is the testimony of Box that its value is $300,000.00. The apparent issues in this case are concerned with the amount owed by the debtor to Tri-Continental and whether Tri-Continental may be required by the bank to proceed first against the mining equipment before relying upon its lien against the office building.

Tri-Continental posits that the balance owed to it, with interest to date of trial, is $198,336.36. It contends that not only is there no equity in the office building but that the debtors have not included the office building in their plan of reorganization. The debtors contend that the plan is one

---

1. Under Texas law an abstract of judgment, when filed of record in the Office of the County Clerk, effects a judgment lien against only non-exempt real estate owned by the judgment debtor in that county of record.

for partial liquidation and that all of their debts, including any monies owed to Tri-Continental and to the bank, will be paid from the proceeds of partial liquidation. They argue that under those circumstances it is not necessary to show in the plan of reorganization the precise purpose to be served by the office building. Further, they acknowledge an indebtedness to the bank in the amount of $36,251.87. However, they contend that after all payments and credits have been applied the balance owed by them to Tri-Continental on the date the bankruptcy petition was filed was only $131,631.75. Thus they contend that the stipulated value of the office building exceeds the aggregate debt of Tri-Continental and the bank by more than $20,000.00.

There is no dispute between the parties as to the payments and credits on the debt to Tri-Continental. In addition to the sum of $7,016.88 which was withheld and applied on February 12, 1982, there were payments of $7,016.88 on April 20, 1982, $21,050.64 on June 28, 1982, $14,033.76 on August 30, 1982, and $14,033.76 on October 26, 1982. On December 14, 1982, the note was accelerated by Tri-Continental and on December 22, 1982, Tri-Continental applied to the note the sum of $70,000.00 which it had collected from a letter of credit issued by Tascosa National Bank. Thus the parties agreed that nine payments of $7,016.88 each have been made (although not *timely* made as required by the note), together with an additional credit of $70,000.00 from a letter of credit. Their only disagreement is to the application of those payments to principal and interest.

■ Tri-Continental claims that the Rule of 78ths should be applied to determine the application of all payments and credits. That rule is primarily used with precomputed consumer credit transactions which are "arrangements whereby the finance charge is added to the principal amount financed, resulting in a sum which represents the total amount of the debt. This amount is then divided into periodic installments, without allocation between principal and interest." Perna, "Computing Interest Rebates Under the Rule of 78ths: A Formula For Usury Upon Default in Maximum Interest Precomputed Credit Transactions", 10 St. Mary's LJ 94 (1978). The "Rule of 78ths" is a mathematical formula for refunding unearned interest when an installment note is paid before maturity. *General Motors Acceptance Corporation v. Uresti*, 553 S.W.2d 660 (Tex.Civ.App.—Tyler 1977, writ ref'd, n.r.e.). It is also used when the acceleration clause has been triggered. *Ford Motor Credit Company v. Long*, 608 S.W.2d 293 (Tex.Civ.App.—Beaumont 1980, writ ref'd n.r.e.).

■ While the Rule of 78ths enjoys widespread use in Texas lending transactions I cannot conclude that it should be applicable to the instant situation. As mentioned above, neither the note nor any of the other security documents contained any disclosure whatsoever as to the interest rate for the $250,000.00 loan. Debtors contend that they were unsuccessful in their continuous efforts to obtain an interest rate disclosure. The instant case, therefore, is one where a promissory note provides for interest but has no specified interest rate and is not concerned with the refunding of interest. Texas law, in V.T.C. A.Bus. & C. § 3.118, is designed to meet that situation. It provides in subparagraph four that "unless otherwise specified a provision for interest means interest at the judgment rate at the place of payment from the date of the instrument, or if it is undated from the date of issue." V.A.C.S. art. 5069–1.05, which was applicable[2] on February 4, 1982, when the note was executed, provides that "all judgments of the courts of this state shall bear interest at the rate of 9% per annum..."

Therefore, the rate of interest which should be applied to the promissory note should be 9% per annum from February 4, 1982, the date of the note, to December 14, 1982, the date of acceleration. As mentioned above debtors did not receive the

**2.** Effective September 1, 1983, the interest rate on judgments in Texas was increased to 10%.

entire $250,000.00 and the sum of $7,016.88 was withheld and applied on February 12, 1982, eight days after the note was executed. Tri-Continental argues that, under the Rule of 78ths, a partial month is treated as a full month and that the entire sum of $7,016.88 was thus earned at the time it was withheld. However, I iterate that this case is not concerned with the refunding of unearned interest and application of the Rule of 78ths is suspect. Although that first sum of $7,016.88 was withheld by Tri-Continental and never received by the debtors the provisions of Bus. & C. § 3.118(4), providing for interest at the judgment rate, contemplates that interest will accrue from the date of the instrument and not from the date of actual receipt of the monies. Therefore, simple interest should be computed on the full $250,000.00 at the rate of 9% from February 4, 1982 to February 12, 1982, at that same rate of 9% on $242,983.12 from February 12, 1982 to the date of the next payment on April 20, 1982, and continuing in the same manner for each period between payments until the note was finally accelerated on December 14, 1982.

After the note is accelerated the issue is whether to apply the 9% interest rate or a higher interest rate. The note provides that "in the event of default in the payment of any sums when due or breach of the terms of the security agreement, all subsequent payments shall, at lender's option, become immediately due and payable together with interest at the *highest legal rate* until paid. Where the interest rate is not set, V.A.C.S. art. 5069–1.04, in paragraphs (a) and (d) sets forth the legal rate applicable. Those provisions essentially provide that the parties to any written contract may agree to and stipulate for any rate of interest that does not exceed (1) an indicated rate ceiling that is the average rate quoted on a bank discount basis for 26 week Treasury Bills issued by the United States Government, as published by the Federal Reserve Board, for the week preceding the week in which the rate is contracted for or, as an alternative, (2) an annualized or quarterly ceiling that is the

average of the computations first mentioned above. The Consumer Credit Commissioner shall compute on the computation dates of December 1, March 1, June 1, and September 1 of each year, the quarterly and annualized ceilings for the next succeeding calendar quarter beginning January 1, April 1, July 1, and October 1, respectively.

The standard quarterly rate ceiling, as computed by the Consumer Credit Commissioner, remained at 18% from the date of acceleration on December 14, 1982, until the beginning of the quarter starting October 1, 1983. The standard quarterly rate ceiling for the last quarter of 1983 was 18.52%. The rate reverted to 18% for the quarter beginning January 1, 1984.

With the guidelines set out above the parties are directed to confer and calculate the balance owed by Amarillo Mining, Inc. and by the debtors to Tri-Continental Leasing Company on February 22, 1984, the date scheduled for hearing on confirmation of debtors' plan. If debtors' plan is confirmed I understand that debtors' intend to pay all creditors, including both Tri-Continental and the bank, from proceeds of partial liquidation of the estate. In that event it will not be necessary to reach the issue as to which properties Tri-Continental should first liquidate. If the plan is not confirmed, or if other resolution appears to be appropriate, I will supplement this memorandum with additional findings and conclusions.

It is, therefore, ORDERED by the Court that counsel for the parties confer and make the mathematical calculations mentioned above.

All relief not herein granted is presently denied without prejudice.